**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                            )
**JENNIFER SAWYER,**                        )
                                            )
        **Plaintiff,**                      )
                                            )        **Civil No.**
        **v.**                              )        **14-13603-FDS**
                                            )
**KINDRED HEALTHCARE, INC.,**               )
                                            )
        **Defendant.**                      )
_____)

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION**
**IN LIMINE AND CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an action alleging retaliation and wrongful termination of employment.
Jurisdiction is based on diversity of citizenship.  Plaintiff Jennifer Sawyer was employed by
defendant Kindred Healthcare, Inc. as the Director of Nursing Services at Seacoast Nursing and
Rehabilitation Center in Gloucester, Massachusetts.  Sawyer alleges that she was unlawfully
terminated from her position in retaliation for reporting patient abuse.

Defendant has moved for summary judgment on all counts.  Plaintiff has cross-moved for
partial summary judgment as to liability and causation, and has also moved to preclude Kindred
from relying on statements that she characterizes as inadmissible hearsay.  For the reasons
described below, plaintiff's motion in limine and motion for partial summary judgment will be
denied, and defendant's motion for summary judgment will be granted.

**I.    Factual Background**

The following facts are undisputed unless otherwise noted.

Seacoast Nursing and Rehabilitation Center is a skilled nursing facility that provides

short-term rehabilitation services and long-term care.  (Doyle Dep. 24).  At all relevant times,

Seacoast was owned by Northeast Health System, Inc. ("NHS"); defendant Kindred Healthcare,

Inc. managed Seacoast pursuant to a management contract between NHS and Kindred.  (*Id.* at

56).  From January 24, 2006, to May 21, 2012, plaintiff Jennifer Sawyer was employed by

Kindred as the Director of Nursing Services ("DON") at Seacoast.  (PSMF ¶¶ 3, 12).[1]

As the DON, Sawyer was responsible for Seacoast's clinical operations, including,

among other things, managing the nursing staff at the facility.  (Doyle Dep. 28).  In her role as

DON, Sawyer was supervised by the Executive Director of Seacoast, Stephen Doyle, who is also

a Kindred employee.  (Sawyer Dep. I-22).[2]  Doyle's responsibilities as Executive Director

extended to overseeing all day-to-day operations at Seacoast.  (Doyle Dep. 13-14).  Other than

Sawyer and Doyle, who were technically employees of Kindred Healthcare, all other personnel

at Seacoast were employed by NHS.  (Sawyer Dep. I-60).

In the six years prior to her termination, Sawyer received consistent praise from Kindred

executives for her positive performance, including from several different executive directors.  In

a December 18, 2007 performance review, then-Executive Director Stanley Trocki wrote, "We

made a great choice in picking [DON Jennifer Sawyer] . . . . She is on top of her department.

She is well liked and respected."  (Pl. Ex. A).  In a 2008 review, Trocki wrote that Sawyer was

"a great partner and an asset to Kindred."  (Pl. Ex. E).   In a January 6, 2010 evaluation, a second

Executive Director, Richard Poumliau, wrote that "Jen is a tremendous asset to Seacoast and we

are pleased to have her in our employ.  (Pl. Ex. B).  Kindred also awarded Sawyer a bonus in

2010 in recognition of Seacoast's achieving two consecutive "zero deficiency" Licensure and

---

[1]  The Court will adopt the acronym "DON," as used by the parties, rather than "DONS."

[2] Citations to Sawyer's deposition include the volume number and page.

Certification surveys.  (Pl. Ex. D).  Sawyer never received any written warnings concerning her job performance prior to the incidents underlying her termination in May 2012.

During Sawyer's employment with Kindred at Seacoast, she reported more than 20 incidents of suspected patient abuse to the Massachusetts Department of Public Health.  (Sawyer Dep. I-65).

On March 17, 2012, a Seacoast nurse called Sawyer to report that a certified nursing assistant and Seacoast employee named Alexis Hartwell had physically assaulted an elderly resident.  (*Id.* at I-96-99).  Sawyer initiated an internal investigation into the incident when she arrived at work on Monday, March 19, 2012.  (*Id.* at I-100).[3]  Sawyer submitted a written preliminary report to the Massachusetts Department of Public Health on March 20, 2012, followed by a final report on March 22, 2012; the report concluded that Hartwell had punched a resident in the chest during a transfer.  (Pl. Exs. F, G; Sawyer Dep. I-110).  Together, Sawyer and Doyle made the decision to terminate Hartwell's employment with Seacoast.  (*Id.*).

Following receipt of Sawyer's reports, the Department of Public Health conducted its own investigation into the incident in mid-April and issued a final report on May 15, 2012.  (Pl. Ex. H).  Ultimately, the DPH found deficiencies at Seacoast that amount to "substandard quality of care," and recommended that Seacoast's participation in Medicare and Medicaid be terminated unless "significant corrections" were made.  (*Id.* at 3).  Specifically, the DPH investigation found that despite earlier warnings about Hartwell's behavior, Sawyer had failed to develop a plan to monitor and address Hartwell's performance.  (Def. Ex. K, "Statement of Deficiencies" at 20-21).  DPH also found that Sawyer had failed to timely investigate three other allegations of misconduct by Hartwell that came to light during Sawyer's original investigation

---

[3] Executive Director Stephen Doyle also participated in the investigation. (Sawyer Dep. I-101).

in March 2012.  (Statement of Deficiencies at 12-13).

On May 17, 2012, following the DPH report, Executive Director Doyle issued a written warning to Sawyer.  (Def. Ex. L; Doyle Dep. 63-64).  As the Executive Director, Doyle had the authority to choose from a range of disciplinary actions with regard to Sawyer.  (*Id.* at 80). Doyle testified that, as of the time he issued the warning, he had not decided to terminate Sawyer from her position and felt that a written warning was sufficient in light of her previous work history.  (*Id.* at 64, 81).  Doyle also notified Sawyer that the two would attend a meeting on Monday, May 21, 2012, with NHS officials to review the DPH findings.  (Sawyer Dep. II-54). However, Doyle contacted Sawyer the day before the meeting to inform her that she would not be allowed to attend.  (*Id.* at II-57).

The meeting was held as scheduled on May 21.  Doyle was present, along with three other Kindred officials.  Northeast Health System was represented by its CEO, Ken Hanover, and two other officials.  (Doyle Dep. 56-59).  The meeting was run by Hanover.

One item on NHS's agenda for the meeting stated that Sawyer would be terminated as Seacoast's Director of Nursing Services.  (*Id.* at 81-82).  Doyle testified that, among other things, Hanover questioned Doyle regarding his decisions to take certain employment actions in response to the DPH findings, expressed his desire for a "culture change" at the facility, and then stated that he (Hanover) wanted Sawyer and four other employees terminated.  (*Id.* at 61, 83).[4] According to Doyle, Hanover said that he "want[ed] to send a clear message that abuse will not be tolerated," and that NHS wanted a zero-tolerance abuse policy.  (*Id.* at 83).[5]

---

[4] The other employees terminated following the meeting were Camille Ciaramitaro, who was the Director of Social Services at Seacoast, and three certified nursing assistants.  (Doyle Dep. 87).

[5] Sawyer has moved to preclude consideration of Hanover's statements on the ground that they are inadmissible hearsay; as set forth below, that motion will be denied.  She does not, however, dispute that Hanover instituted a zero-tolerance policy at the meeting.  (*See* PSMF ¶ 13).

After the meeting, Doyle called Sawyer to inform her that he had been given a directive that she "[could not] come back to work."  (Sawyer Dep. II-60).

## II.   <u>Plaintiff's Motion in Limine</u>

Sawyer has moved to preclude Kindred from offering any references to or statements made by Northeast Health System's former CEO, Ken Hanover.  Sawyer contends that under Fed. R. Civ. P. 37(c), Kindred may not now offer "testimony, statements, or references" to Hanover because it did not identify Hanover as a witness under Fed. R. Civ. P. 26.  Rule 37 provides that if a party fails to identify a witness as required by Rule 26, that party may not use that witness "to supply evidence on a motion, at a hearing, or at a trial . . . ."  Fed. R. Civ. P. 37(c)(1).

"A party is [not] obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use."  Fed. R. Civ. P.  26, Advisory Comm. Notes, 2000.  "Accordingly, even if an individual has personal knowledge of facts relevant to the parties' claims and defenses, a party is not obligated to disclose the individual if the party does not intend to use the individual to support its claims or defenses."  *Columbia Data Products, Inc. v. Autonomy Corp.*, 2012 WL 6212898, at *2 (D. Mass. Dec. 12, 2012) (listing cases).  Kindred is not seeking to use Ken Hanover as a witness, and plaintiff's request to preclude all "references" to him is entirely unwarranted.  Plaintiff's motion in limine will be denied.

Sawyer further objects to certain statements allegedly made by Hanover to Seacoast Executive Director Stephen Doyle as inadmissible hearsay.  Although Sawyer seeks to exclude "any and all" statements allegedly made by Hanover, her primary focus is on Doyle's testimony that Hanover instructed him to remove Sawyer as the Seacoast DON.  (Pl. Rep. 1).  Doyle's testimony at his deposition was as follows:

> At some point, Ken Hanover asked why I handled things the way I did with the employees, and I explained that to them.  And then he said, "I understand" or something to that effect, and said, "This is what I want, I want Jen [Sawyer] out, I want Camille [Ciaramitaro] fired, I want these other CNA's fired.  I want to send a clear message that abuse will not be tolerated" and [that NHS] wanted a zero tolerance policy.

(Doyle Dep. 83).

Hearsay is a statement made by an out-of-court declarant offered "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  The statements at issue are not, however, offered for their truth; they are offered to show that Hanover directed Doyle to terminate Sawyer's employment.  Such an instruction is not hearsay.  Put another way, it does not matter whether Hanover truly did want Sawyer fired—what matters is only that the statements were made and that, as a result, Doyle *thought* Hanover wanted Sawyer fired.  Accordingly, the statements do not fall within the definition of hearsay.  *See United States v. Diaz*, 670 F.3d 332, 346 (1st Cir. 2012) ("Out-of-court statements providing directions from one individual to another do not constitute hearsay."); *see also United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("[A] statement offered to show its effect on the listener is not hearsay.").  Alternatively, the statements are offered to show the state of mind of Hanover, which falls squarely within the exception set forth in Fed. R. Evid. 803(3).[6]

Because Hanover's statements are not hearsay, they may be considered on the present cross-motions for summary judgment.

## III.   Cross-Motions for Summary Judgment

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

---

[6] Plaintiff contends that these statements are hearsay because "they are being used to prove that the Plaintiff's termination was justified . . . ."  (Pl. Rep. 2).  That is not, however, the matter asserted "in the statement[s]."  *See* Fed. R. Evid. 801(c).

822 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992) (internal quotation marks omitted).

Summary judgment is appropriate when the moving party shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB

Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986)).  In making that determination, the court must view "the record in the light

most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v.

Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary

judgment is made, the adverse party must set forth specific facts showing that there is a genuine

issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations

omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his

pleading," but instead must "present affirmative evidence."  *Id*. at 256-57.

### A.        Retaliation in Violation of Mass. Gen. Laws ch. 111, § 72G (Count One)

In Count One, Sawyer asserts that she was terminated in retaliation for reporting a claim

of patient abuse in violation of Mass. Gen. Laws ch. 111, § 72G.  That statute makes it unlawful

for a health facility to "retaliate against any person who, in good faith, makes [ ] a

report . . . about the abuse, mistreatment or neglect of a patient or resident . . . ."  Mass. Gen.

Laws ch. 111, § 72G.  Where no direct evidence of retaliatory animus and causation exists,

courts evaluate a claim for retaliation in an employment context using a three-stage burden-

shifting method of proof.  *See Mole v. University of Massachusetts*, 442 Mass. 582, 591-92

(2004) (applying burden-shifting framework to retaliation claims under Massachusetts

antidiscrimination statute, Mass. Gen. Laws ch. 151B, § 4); *O'Connor v. Jordan Hosp.*, 2013 WL 3105647 (D. Mass. June 17, 2013) (applying burden-shifting framework to retaliation claims under the Healthcare Provider Whistleblower Statute, Mass. Gen. Laws ch. 149, § 187).

In the first stage, the plaintiff must establish a *prima facie* case for retaliation.  To state a *prima facie* case for retaliation in an employment context, the plaintiff must establish that (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.  *See Mole*, 442 Mass. at 591-92.  Kindred does not contest that Sawyer can make out a *prima facie* case of retaliation.  At the second stage, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision.  *Id.*  If the defendant does so, the plaintiff must produce evidence to show that the proffered reason is a pretext for retaliation.  *Id.*

### 1.      Kindred's Legitimate, Non-Retaliatory Reason

The second step of the analysis is relatively easy to resolve.  Kindred contends that its customer, NHS, directed it to remove Sawyer as the Director of Nursing Services at Seacoast.  More specifically, Kindred contends that NHS CEO Ken Hanover wanted to institute a zero-tolerance policy for patient abuse and desired a "culture change" at the facility in the wake of the DPH investigation that found significant shortcomings at Seacoast.  Thus, Kindred has articulated a "legitimate, nondiscriminatory" reason sufficient to meet its burden of production at the second stage of the analysis.

### 2.      Pretext and Retaliatory Animus

Once the defendant has put forth evidence of a legitimate, non-retaliatory reason for the termination, the burden shifts back to the plaintiff to show that "the articulated nonretaliatory reasons were pretext."  *Mole*, 442 Mass. at 591 (citing *McMillan v. Massachusetts Soc'y for the*

*Prevention of Cruelty to Animals*, 140 F.3d 288, 309 (1st Cir. 1998); *Mesnick*, 950 F.2d at 827).

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [non-retaliatory] reasons." *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662-63 (1st Cir. 2010) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

An employee's strong record with an employer as reflected in performance reviews and pay increases may be evidence of pretext when an employer later claims that the employee was fired for poor performance. *See Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2002). It is undisputed that Sawyer received multiple positive evaluations during her employment at Kindred. The record is also sufficient to demonstrate that Sawyer had a good reputation at Kindred, and that Doyle thought highly of her. Sawyer also repeatedly points out that Doyle himself thought that she deserved only a written warning following the DPH report in May 2012, based on her previous strong performance at Kindred.

Taken as whole, however, those facts simply further reinforce Kindred's explanation that Sawyer was fired because its customer, NHS, wanted her removed. Kindred does not contend that Sawyer was terminated because Kindred was unhappy with her performance; therefore, her positive employment record prior to the DPH investigation does little to call into question Kindred's stated reason for firing her.

Sawyer's only potential evidence that her firing was based on a retaliatory animus is the temporal proximity between her initial reports to DPH and her firing two months later. "However, this two-month period is not sufficient, by itself, to raise an inference of pretext."

*Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 179 (1st Cir. 2015) (assessing

evidence of pretext in Title VII retaliation claim). Moreover, the timing of Sawyer's firing—

immediately after Doyle's meeting with NHS executives, held only a few days after the release

of the DPH report—further mitigates against a finding of pretext. *See id.* (temporal proximity

unsupportive of pretext where timing of firing "makes sense" given other events) (citing

*Mariani-Colon v. Department of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 224 (1st Cir.

2007)).

      The parties do not dispute that Sawyer was an at-will employee. As a general matter, if

an employee is an at-will employee, an employer can fire her for any reason—fair or unfair, right

or wrong, rational or irrational—as long as the decision is not based, even in part, on retaliation

for engaging in protected conduct. It is not the role of the federal courts to supervise or second-

guess the business decisions of corporate managers. *See Melendez v. Autogermana, Inc.*, 622

F.3d 46, 53 (1st Cir. 2010) (citing *Mesnick*, 950 F.2d at 825).

      Kindred has presented substantial uncontested evidence that it had a valid, non-retaliatory

reason for firing Sawyer. The record includes uncontested evidence that Sawyer was the

Director of Nursing Services at Seacoast; that Seacoast was investigated by the Department of

Public Health; that the DPH found "significant deficiencies" at Seacoast and imposed significant

sanctions; that NHS, the corporate owner of Seacoast and Kindred's customer, wanted a "culture

change" following the DPH report; and that NHS directed Kindred to remove Sawyer from her

position as DON.

      Although not dispositive, Sawyer's own deposition testimony further highlights the lack

of evidence of retaliatory animus on the part of either Kindred or NHS. Sawyer testified that she

had made more than 20 reports of patient abuse to DPH before her March 2012 reports, and

never felt she had been retaliated against for doing so.  (Sawyer Dep. II-33-34).  She also

testified that no Kindred or NHS manager or official ever displayed anger or hostility towards

her because of the report, or ever discouraged her from reporting abuse.  (*Id.* at 44-45).  Finally,

Sawyer testified that even she did not believe that anyone at Kindred or NHS was motivated to

retaliate against her based on her report.  (*Id.* at 43-44).

To be clear, an employer is not immunized from liability for a retaliatory termination

simply because it merely follows the directive of a key customer.  *Cf. Joseph v. Owens & Minor*

*Distribution, Inc.*, 5 F. Supp. 3d 295, 314 (E.D.N.Y. 2014), *aff'd sub nom.*, 594 F. App'x 29 (2d

Cir. 2015) ("When a customer's reason for complaining about an employee is itself racially-

motivated, an employer cannot rely on such complaints as being 'nondiscriminatory' reasons for

[termination].");  *Wigginess Inc. v. Fruchtman*, 482 F. Supp. 681, 692 (S.D.N.Y. 1979), *aff'd*, 628

F.2d 1346 (2d Cir. 1980) ("Employers may not discriminate on the basis of their customers'

preferences.").  The record, however, contains no evidence that NHS wanted Sawyer terminated

in retaliation for her report to the DPH, or that NHS otherwise had an improper motive.

"To defeat summary judgment, a plaintiff must make a colorable showing that an

adverse action was taken 'for the purpose of retaliating' against him."  *Mariani-Colon*, 511 F.3d

at 224 (quoting *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997)).  Sawyer's evidence of

pretext or retaliatory animus is essentially non-existent.  The overwhelming weight of the record

evidence—in fact, nearly all of the record evidence—indicates that Kindred's stated reason for

firing Sawyer was, in fact, the actual reason behind her firing.  "[A] plaintiff cannot defeat

summary judgment by relying on 'conclusory allegations, or rank speculation.'"  *Mariani-Colon*,

511 F.3d at 224 (1st Cir. 2007) (quoting *Fontánez–Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 55

(1st Cir. 2006)).  Accordingly, Kindred's motion for summary judgment will be granted as to

Count One, and Sawyer's motion for partial summary judgment will be denied.

**B.      Retaliation in Violation of the Healthcare Provider Whistleblower Statute, Mass. Gen. Laws ch. 149, § 187 (Count Two)**

In Count Two, Sawyer asserts that her termination was in violation of the Massachusetts Healthcare Provider Whistleblower Statute, Mass. Gen. Laws ch. 149, § 187.  The Massachusetts Healthcare Provider Whistleblower Statute makes it unlawful for a health care facility to "take any retaliatory action against a health care provider" who "files a report . . . discussing allegations of unsafe, dangerous or potentially dangerous care."  Mass. Gen. Laws ch. 149, § 187(b).  The statute creates a two-year limitations period within which a plaintiff must "institute a civil action in the superior court."  Mass. Gen. Laws ch. 149, § 187(d).  Sawyer was terminated from her employment on May 21, 2012, but did not file her complaint until September 10, 2014.  Sawyer contends that she satisfied the statute of limitations by sending a letter to Kindred's President, Paul Diaz, on February 19, 2014, and that "defendant was well aware that the Plaintiff would be pursuing a claim . . . ."  (Pl. Opp. 13).  However, the statute plainly requires that a "civil action" must be "institute[d]" in order for the claim to be timely.  Because Sawyer did not institute a civil action until more than two years after her firing, her claim under the Massachusetts Healthcare Provider Whistleblower Statute is untimely.  Kindred's motion for summary judgment will therefore be granted as to Count Two.[7]

**C.      Wrongful Termination in Violation of Public Policy (Count Three)**

In Count Three, Sawyer asserts a claim for wrongful termination in violation of public policy based on the same factual allegations that make up her claims in Counts One and Two.

---

[7] Even if Sawyer had filed suit within the limitations period, Kindred would still be entitled to summary judgment because, as discussed above, she has produced no evidence that she was fired in retaliation for reporting patient abuse.

"The rationale for implying a private remedy under the 'public policy exception' to the traditional rule governing at-will employment contracts is that, unless a remedy is recognized, there is no other way to vindicate such public policy." *Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 511-12 (1985), *aff'd*, 397 Mass. 1004 (1986).  Thus, it is well-established that a plaintiff may not bring a common-law claim for termination in violation of public policy where the legislature has provided the plaintiff with a detailed statutory remedy.  *See, e.g.*, *id.* at 512-513 (Mass. Gen. Laws. ch. 151B precludes common-law claim for age discrimination in employment); *Cousin v. Sofono, Inc.*, 2003 WL 22391233, at *8 (public-policy claim precluded by federal Family Medical Leave Act).

Here, Sawyer contends that her termination was retaliation for her reporting patient abuse at Seacoast to the Department of Health.[8]  That activity falls directly within the conduct protected by Mass. Gen. Laws. ch. 111, § 72G and Mass. Gen. Laws ch. 149, § 187.  Further, the latter statute provides a "comprehensive remedial scheme to vindicate the public policy of protecting health care workers who report illegal conduct."  *Joyce v. GF/Pilgrim, Inc.*, 2003 WL 22481100, at *7 (Mass. Super. Sept. 30, 2003).  As a result, Sawyer's common-law claim is barred.  *See id.*  Kindred's motion for summary judgment will therefore be granted as to Count Three, and Sawyer's motion for partial summary judgment will be denied.[9]

### D.   Violation of Employee Handbook and Implied Employment Contract

Sawyer also appears to request partial summary judgment on the ground that her termination was in violation of Kindred's employee handbook.  An employee handbook or

[8] Although her argument is far from clear, it appears that Sawyer also contends that her termination was against public policy because, as she alleges, it was in violation of Kindred's employee handbook.  That handbook, however, does not constitute "public policy."

[9] Again, even if the existing statutory remedy did not preclude Sawyer's common-law claim, it would still fail for lack of any evidence that she was terminated in retaliation for reporting patient abuse.

13

personnel manual may form the basis of an implied contract in some circumstances.  *See generally O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686 (1996).[10]  However, Sawyer has not identified any evidence in the record to indicate that those circumstances were present here.  More importantly, however, there is no claim for breach of an implied contract set out in complaint, and accordingly such a claim has not been properly asserted in this case.[11]

### E.        Termination without Cause in Violation of Implied Employment Contract

Sawyer also appears to request partial summary judgment based on the contention that her termination violated her implied employment contract because it was "without cause."  (Pl. Mem. 11).  As an initial matter, Sawyer has produced no evidence at all to support her contention that Kindred required "just cause" to terminate her employment.  What evidence she has submitted tends to show that her employment with Kindred was "on an at-will basis."  (Pl. Ex. G, Employee Handbook, at 6).  And as an at-will employee, Kindred could terminate Sawyer with or without good cause.  *See Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 9 (1988) ("Employment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all.").  In any event, there is no claim for termination without just cause set out in the complaint, and therefore that claim has also not been properly asserted in this case.

---

[10] In *O'Brien*, the Supreme Judicial Court listed several "factors that would or might make a difference in deciding whether the terms of a personnel manual" created an implied contract.  422 Mass. at 692.  Those factors include (1) whether the terms of the manual were negotiated; (2) whether the employer retained the right unilaterally to change the terms of the manual; (3) whether the employee signed the manual, acknowledged understanding of its terms, or if the employer otherwise called "special attention" to it; and (4) the manner of the manual's preparation and distribution.  *Id.* at 692-93.

[11] Sawyer contends that Kindred knew the handbook would be a part of her claims because she deposed Doyle on the handbook. To say that Kindred should have been aware that she would rely on the handbook in proving her retaliation claims, however, is a far cry from demonstrating that Kindred should have been on notice that she was asserting a separate claim for breach of implied contract.

**IV.**      <u>**Conclusion**</u>

For the reasons set forth above, plaintiff's motion in limine is DENIED; plaintiff's motion for partial summary judgment is DENIED; and defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor<br>
F. Dennis Saylor IV<br>
United States District Judge

Dated: May 16, 2016